**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CURE LAND, LLC; CURE LAND II, LLC,

     Plaintiffs - Appellants,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE; TOM VILSACK, in his
official capacity as Secretary of the United
States Department of Agriculture; FARM
SERVICE AGENCY, an agency of the
United States Department of Agriculture;
JUAN M. GARCIA, in his official capacity as
Administrator of the Farm Service Agency,

     Defendants - Appellees.

No. 14-1415

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:12-CV-02388-WJM)**
_____

Jessica E. Yates (John O'Brien, with her on the briefs), Snell & Wilmer L.L.P., Denver,
Colorado, for Plaintiffs-Appellants.

Michael C. Johnson, Assistant United States Attorney (John F. Walsh, United States
Attorney, with him on the briefs), Office of the United States Attorney, District of
Colorado, for Defendants-Appellees.
_____

Before **TYMKOVICH**, Chief Judge, **EBEL**, and **PHILLIPS**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

This case concerns a rural water conservation program administered in part by Defendants-Appellees United States Department of Agriculture ("USDA"), the Secretary of the USDA, the Farm Service Agency ("FSA"), and the Administrator of the FSA (collectively, "the agency"). Plaintiffs-Appellants Cure Land, LLC, and Cure Land II, LLC (collectively "Cure Land") contend that the agency's handling of a proposed amendment to the conservation program ran afoul of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, and the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706. The district court upheld the agency's actions. We affirm.

## I.    BACKGROUND

Under the Colorado Republican River Conservation Reserve Enhancement Program ("the conservation program" or "the program"), enrolled cropland owners receive payments in exchange for committing to cease irrigation of their land. By removing marginal cropland from agricultural production, the program aims to achieve various local environmental benefits, including conserving groundwater, improving surface water quality, controlling erosion, and protecting wildlife. The conservation program is implemented and funded by the FSA and USDA in partnership with local and state entities, including, as relevant here, the Republican River Water Conservation District ("the District").

The program originally authorized enrollment of up to 35,000 acres of cropland throughout the northeastern corner of Colorado. To participate, landowners—like Cure Land—that seek compensation for ceasing groundwater irrigation are required to cancel

2

their well permits, seal their wells, and implement practices intended to restore their land

to its natural state.[1] Landowners who retire wells adjacent to either of two river branches

in the Republican River basin deemed critical for improving water quality and wildlife

habitat receive extra incentive payments in addition to the base pay rate.

In 2007, the District proposed an amendment to the conservation program. In

general, the amendment would expand the conservation program, increasing the

enrollment area to 55,000 acres, adding two participating counties, increasing program

funding, and authorizing incentive payments for land adjacent to a third critical river

branch.

In addition, the amendment would create a so-called "target zone" within the

original program boundaries.[2] In that zone, different rules would apply. First, although

the zone is not adjacent to a critical river branch, landowners would be entitled to extra

incentive payments for enrolled acres. Second, rather than retiring the wells on those

acres, landowners could instead participate in the program by conveying their

groundwater rights to the District, which would use the water to help satisfy Colorado's

obligations under the Republican River Compact Compliance Agreement ("the

compact").

The compact allocates water from the Republican River among the states of

Colorado, Nebraska, and Kansas. As of 2007, Colorado was out of compliance with the

---

[1] Required practices can include planting native grasses, restoring wetlands, and increasing riparian buffers.
[2] The target zone, approximately fifty square miles of land, would be situated north of Wray, Colorado, near the Nebraska border.

compact's streamflow requirements. To address the state's noncompliance, the District planned to transport water pumped from the target zone through a pipeline and release it into the North Fork of the Republican River ("the North Fork") just shy of the state border. Accordingly, in 2008, the District preemptively purchased groundwater rights from the predominant landowner in the target zone—Cure Land.[3] The District also began construction (since completed) on the pipeline.

The agency initially expressed concern over whether the target zone would serve the conservation program's environmental goals, inasmuch as there was no guarantee the neighboring states receiving the groundwater would put it to an environmentally beneficial use. Nonetheless, in an October 2009 letter, the agency notified the District that it generally supported the amendment as a whole. As required by NEPA, the agency began preparing a supplemental environmental assessment of the program amendment.

While preparing the assessment, the agency encountered public opposition to the target zone in the form of emails, letters, phone calls, a signed petition, and formal comments on the circulated draft assessment. Local citizens and nearby water districts objected to the target zone because they believed it would inure solely to the benefit of Cure Land, who appeared poised to obtain a windfall by receiving program payments for ceasing to use water that it had already sold to the District for a large sum. Moreover, because the "conserved" water would not contribute to replenishment of the overdrawn

---

[3] Actually, the District paid approximately $50 million for Cure Land's groundwater rights, but immediately leased the rights back to Cure Land, provisioned on Cure Land's obligation to terminate the lease upon the successful enrollment of its cropland in the conservation program.

4

aquifer underlying the Republican River basin, but rather would be pumped to neighboring states, opposing parties doubted that any local environmental or economic benefits would be realized.

In November 2010, the agency published its supplemental environmental assessment of the proposed amendment. The assessment concluded that the proposed amendment would have no significant negative environmental impacts; instead, the resulting surface and groundwater savings would have overall beneficial long term effects on water resources, wildlife, and wildlife habitat in the region. The assessment acknowledged the public's input regarding the alleged inequity and inefficacy of the target zone, but concluded that it raised issues beyond the scope of the assessment's environmental inquiry.[4]

At that point, the NEPA process stalled. The agency delayed issuing a formal finding of no significant impact ("FONSI") while it considered how to handle the public opposition to the target zone. Finally, in April 2012, after considering various options, the agency issued a finding of no significant impact that applied only to the proposed amendment without the target zone.

The parties agree that the target zone component of the proposed amendment cannot proceed unless it is authorized by a FONSI. Cure Land expresses the concern that, without target zone eligibility, the cropland on which Cure Land sold groundwater rights to the District cannot be enrolled in the conservation program. With the NEPA

---

[4] However, in response to the public's opposition, the District voted to decrease the proposed target zone incentive payments.

5

process thus resolved against its interests, Cure Land brought this suit, contending that the agency's decision not to include the target zone in the FONSI violates NEPA, 42 U.S.C. §§ 4321-4370f, and the APA, 5 U.S.C. §§ 701-706. The district court entered judgment in favor of the agency. Cure Land now appeals.

## II. DISCUSSION

### A. NEPA's Requirements

NEPA "declares a broad national commitment to protecting and promoting environmental quality." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989). To that end, it "imposes procedural requirements intended to improve environmental impact information available to agencies and the public." New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 704 (10th Cir. 2009). NEPA does not, however, "require agencies to reach particular substantive environmental results." Los Alamos Study Grp. v. U.S. Dep't of Energy, 692 F.3d 1057, 1060 (10th Cir. 2012). Rather, "it requires only that the agency take a 'hard look' at the environmental consequences before taking a major action." Citizens' Comm. to Save Our Canyons v. Krueger, 513 F.3d 1169, 1178 (10th Cir. 2008) (quoting Utah Shared Access All. v. U.S. Forest Serv., 288 F.3d 1205, 1207-08 (10th Cir. 2002)).

To comply with NEPA, a federal agency undertaking a major action "significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), "must prepare a thoroughgoing [environmental impact statement] . . . assessing the predicted impacts of the proposed action on all aspects of the environment." Richardson, 565 F.3d at 703. If the agency decides to continue with a major federal action in

6

spite of significant environmental impacts, it must explain its reasons for doing so in a record of decision. 40 C.F.R. § 1505.2.

Alternatively, where it is unclear whether a proposed action's environmental effects will be significant, "the agency may first prepare a less detailed environmental assessment ('EA')." Greater Yellowstone Coal. v. Flowers, 359 F.3d 1257, 1274 (10th Cir. 2004) (citing 40 C.F.R. § 1501.4(b)). "If the EA leads the agency to conclude that the proposed action will not significantly affect the environment, the agency may issue a finding of no significant impact" and proceed with the federal action without further ado. Id. (citing 40 C.F.R. § 1501.4(e)).

## B. Standard of Review

We review an agency's compliance with NEPA pursuant to the APA. Utah Envtl. Cong. v. Russell, 518 F.3d 817, 823 (10th Cir. 2008). Our review is de novo with respect to the district court's decision, but "highly deferential" to the agency. Krueger, 513 F.3d at 1176. "A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." Id. "We will not set aside an agency decision unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Russell, 518 F.3d at 823 (quoting 5 U.S.C. § 706(2)(A)). "The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." Krueger, 513 F.3d at 1176 (quotation omitted).

7

**C. Final Agency Action**

Before reaching the merits, we address the agency's contention that we lack subject matter jurisdiction over Cure Land's challenge to the FONSI. Under the APA, federal courts have jurisdiction to review challenges to "final agency action." Chem. Weapons Working Grp., Inc. (CWWG) v. U.S. Dep't of the Army, 111 F.3d 1485, 1494 (10th Cir. 1997); see 5 U.S.C. § 704. Although the agency concedes that "a FONSI can serve as a final decision," Aple. Supp. Br. 4, it maintains that its FONSI does not, due to the FONSI's concluding paragraph, which reads:

> Since the proposed Amendment to the Republican River [conservation program] has not been finalized as of the signing of this FONSI, the agency and state partners may adjust the details of the Amendment during negotiations. Unless those changes result in a significant expansion or increase of the Amendment addressed in the Supplemental EA, this FONSI is still applicable and no Environmental Impact Statement will be prepared.

AR 499.

We disagree with the agency's concern. "The Supreme Court has 'interpreted the finality element in a pragmatic way.'" Ctr. For Native Ecosystems v. Cables, 509 F.3d 1310, 1329 (10th Cir. 2007) (quoting FTC v. Standard Oil of Calif., 449 U.S. 232, 239 (1980)). "[A]gency action is final if it satisfies two requirements: 'First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" Id. (quoting Bennett v. Spear, 520 U.S. 154, 177-78 (1997)).

8

The FONSI satisfies the first finality requirement because it is the final step in the agency's NEPA decision-making process, see 40 C.F.R. §§ 1501.4, and there is no indication that the FONSI's conclusion—namely, that the proposed expansion of the conservation program will not have significant negative environmental impacts— is tentative or interlocutory in nature. See Sierra Club v. U.S. Army Corps of Eng'rs, 446 F.3d 808, 816 (8th Cir. 2006) (finding a FONSI was final agency action because, even though prerequisites to breaking ground on the underlying project remained unmet, "the decision to issue a FONSI was the culmination of the agency's NEPA decision-making"); Pennaco Energy, Inc. v. U.S. Dep't of Interior, 377 F.3d 1147, 1155 (10th Cir. 2004) (finding that an agency's decision to require additional NEPA documentation for mineral leases was a final agency action because the "decision was a definitive statement of its position" regarding NEPA compliance and the agency's "conclusion on that point was neither tentative nor interlocutory in nature").

We find it irrelevant that the exact terms of the underlying amendment to the conservation program may not be final. Cure Land challenges the FONSI, not the proposed amendment. Nor are we swayed by the FONSI's caveat that the agency may revisit the FONSI if the proposed amendment undergoes "a significant expansion or increase," AR 499. That much is true of any major federal project, whether or not it is stated explicitly in the corresponding FONSI. See Richardson, 565 F.3d at 705 ("An agency must prepare a supplemental assessment if 'the agency makes substantial changes in the proposed action that are relevant to environmental concerns.'" (quoting 40 C.F.R. § 1502.9(c)(1)(i))).

9

The FONSI satisfies the second finality requirement because it establishes which changes to the conservation program the agency may implement immediately—and which would require additional process to comply with NEPA. See Pennaco, 377 F.3d at 1155-56. That determination, moreover, is the source of the procedural injury that Cure Land advances on appeal. See Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 737 (1998) ("NEPA . . . simply guarantees a particular procedure, not a particular result. Hence a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper.");[5] see also Friends of Marolt Park v. U.S. Dep't of Transp., 382 F.3d 1088, 1095 (10th Cir. 2004) (holding that a record of decision was final agency action, even though it remained unclear which of the alternative underlying actions the agency would ultimately pursue, because "a claim that an agency violated NEPA's procedural requirements becomes ripe when the alleged procedural violation occurs"). Consequently, the FONSI determines the parties' respective "rights and obligations," and is an action from which legal consequences flow. See Cables, 509 F.3d at 1329.

Where "an agency has issued a 'definitive statement of its position, determining the rights and obligations of the parties,' the agency's action is final notwithstanding 'the possibility of further proceedings in the agency' on related

---

[5] "While th[o]se statements are dicta, this court considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings . . . ." Gaylor v. United States, 74 F.3d 214, 217 (10th Cir. 1996).

issues." Id. at 1329 (quoting Bell v. New Jersey, 461 U.S. 773, 779-80 (1983)).  We are satisfied that we have jurisdiction over Cure Land's appeal.

### D. Alleged conflict between the EA and the FONSI

With jurisdiction confirmed, we turn to the merits of Cure Land's appeal. Cure Land's primary contention is that the FONSI contradicts the EA's findings concerning the environmental impacts of the target zone, such that the agency acted arbitrarily and capriciously in failing to explain that inconsistency.

It is axiomatic that, if the FONSI was materially different from or contradictory to the underlying EA's findings, the agency would need to provide a "reasoned explanation" for the difference.  See Fed. Commc'n. Comm'n. v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (holding that, while an agency changing position "need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate[,] [s]ometimes it must—when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy").  "[U]nexplained conflicting findings about the environmental impacts of a proposed agency action violate the APA."[6] Organized

---

[6] The district court held that the agency need not explain inconsistencies between the EA and the FONSI because the EA "was not formally promulgated." AR 2174.  It is true that inconsistencies with preparatory, informal, or internal agency documents may not trigger the requirement for "further justification," Fox, 556 U.S. at 516.  See, e.g., Dist. Hosp. Partners, L.P. v. Burwell, 786 F.3d 46, 60 (D.C. Cir. 2015) (holding that a discrepancy between a final rule and an unpublished, internal draft did not require explanation).  For that reason, the agency's 2009 letter initially expressing support for the proposed amendment and its 2010 unsigned draft FONSI originally approving the target zone do not require additional explanation.

11

<u>Vill. of Kake v. U.S. Dep't of Agric.</u>, 795 F.3d 956, 969 (9th Cir. 2015) (en banc) (holding that issuance of a NEPA record of decision that contradicted the agency's findings in a previous record of decision without explanation was arbitrary and capricious); <u>see also</u> <u>Friends of Marolt Park</u>, 382 F.3d at 1095 (requiring that an agency's record of decision explain inconsistencies with the findings in its environmental impact statement).

We disagree, however, with Cure Land's interpretation of the FONSI. Because we conclude that the FONSI is, in fact, <u>consistent</u> with the EA, the foregoing concerns are not implicated.

We begin our analysis with the EA. The EA studied the environmental impacts of the amendment as a whole and concluded, "There are no expected long term significant negative impacts associated with implementation of the Proposed Amendment." AR 551. In fact, the expansion of the conservation program would result in net positive environmental effects:

> Enrolling land in [the program] and installing [conservation practices] . . . would decrease groundwater withdrawal, reduce the application of agricultural chemicals in the . . . area, and reduce erosion and sedimentation, ultimately increasing groundwater storage and streamflows, improving surface water quality, and improving wetland

Environmental assessments, however, are not internal, informal, or preparatory. Rather, they are public documents meant to be an agency's final analysis of whether an environmental impact statement is needed. <u>See</u> 40 C.F.R. §§ 1501.4(e)(1), 1508.9(a)(1)). Moreover, an agency's FONSI is supposed to be based on the findings in its EA. <u>Id.</u> § 1508.13. Contrary to the district court's conclusion, a failure to explain inconsistencies between those documents could preclude an agency from articulating the requisite "rational connection between the facts found and the decision made," <u>Krueger</u>, 513 F.3d at 1176, thereby rendering that agency's decision arbitrary and capricious.

12

habitat.  <u>The Amendment would have long term beneficial impacts to water resources within the Republican River basin and areas downstream</u>.

AR 541 (emphasis added).

It is true that the EA found that groundwater from the target zone could contribute to some of those environmental benefits, to the extent that increased streamflow in the North Fork would improve downstream wildlife habitat.  However, the EA gave no indication that those benefits were <u>necessary</u> to its conclusion that the overall amendment would have no negative impacts.[7]  Nor are they:  The EA also makes clear that the other components of the amendment, such as increasing enrollment by 20,000 acres and incentivizing enrollment near a third critical tributary to the Republican River, would bring environmental benefits in their own right, including groundwater savings that would replenish the depleted underlying aquifer.[8] Those benefits outweigh the negligible negative impacts associated with the amendment. <u>See</u> AR 540 (deeming the only negative impact of the amendment to be temporary habitat disruption from the installation of conservation practices).

---

[7] Nor, does it seem, is creation of the target zone necessary to achieve those surface water benefits. The District's ability to buy groundwater rights and divert the water through its pipeline to the North Fork is independent of the corresponding cropland's eligibility for the conservation program.  In fact, it appears that the termination provisions in Cure Land's lease could allow the District to repossess the groundwater and use it for compact compliance.

[8] In fact, removing the target zone (that is, declining to change the enrollment requirements in the target zone to allow "conserved" groundwater to be pumped to neighboring states) would only <u>increase</u> the projected groundwater benefits within the Republican River Basin.

13

With the EA's factual findings in mind, we proceed to the FONSI. The FONSI concluded,

> On the basis of the analysis and information contained in the Supplemental EA and this document, it is [FSA's] determination that adoption of the preferred alternative without the Target Zone does not constitute a major Federal action affecting the quality of the human and natural environment.

AR 499.

> With respect to the target zone, the FONSI explained

> In consideration of the analysis documented in the Supplemental EA . . . FSA has determined that the preferred alternative would not constitute a major State or Federal action affecting the human and natural environment if the Target Zone was eliminated from the preferred alternative. Therefore, the Target Zone has been removed from the preferred alternative and a Finding of No Significant Impact is being rendered.

Id. The parties advance different readings of that language.

Cure Land contends that the words "if" and "therefore" necessarily convey a contingency: The proposed amendment will have significant negative environmental impacts unless the target zone is removed. That is not an indefensible reading. If adopted, it would render the FONSI inconsistent with the EA's factual finding that the proposed amendment including the target zone would not have significant negative environmental impacts.

The agency, on the other hand, contends that the language means just what it says—that is, that the proposed amendment minus the target zone will not have significant environmental impacts—and is silent as to what the impacts would be if the target zone were created. That is also a permissible reading. If adopted, it would

14

render the FONSI consistent with the EA's findings regarding the environmental benefits of the remaining components of the proposed amendment.

We defer to the agency's permissible interpretation of its own language. A presumption of validity attaches to the agency's action, <u>Richardson</u>, 565 F.3d at 705, and we owe at least some deference to the agency's interpretation of its own document. <u>See</u> <u>Krueger</u>, 513 F.3d at 1176 ("Our review is highly deferential."). Even if we did not, it is pellucid that removal of the target zone was not, in fact, necessary to avoid significant negative environmental impacts from the amendment. And there is no suggestion in the EA, the FONSI, or the remainder of the record that the agency intended the words "if" and "therefore" to bear the weight Cure Land assigns them.[9] The balance of the record sits in tension with Cure Land's interpretation. For that reason, also, we decline to adopt it.

Because we find that the FONSI's determination is not materially different from or contradictory to the EA's factual findings, the agency was not arbitrary and capricious for failing to explain its removal of the target zone component in greater detail.

---

[9] Cure Land emphasizes the fact that an agency official recommended adding the phrase "[t]herefore the Target Zone has been removed from the preferred alternative" to the FONSI because it "makes the point more directly than the preceding sentence alone." Reply 21 n.3 (quoting AR 2074). From the context of the recommendation, however, it is unclear what "point" the official was referring to. There is no indication that the "point" was that the Target Zone would cause significant negative environmental impacts. To the contrary, it would make more sense that the "point" was that which was conveyed by the added language: that the agency was removing the Target Zone from the preferred alternative.

15

### E. Mitigation Measure

Cure Land's misinterpretation of the FONSI is a common thread through most of its remaining arguments. Cure Land next contends that declining to create the target zone constitutes an improper mitigation measure. Mitigation measures permit an agency to issue a FONSI "even if it finds a potentially significant impact so long as it also finds changes or safeguards in the project sufficiently reduce the impact to a minimum." Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs, 702 F.3d 1156, 1172 (10th Cir. 2012) (quotation omitted). Such "[m]itigation measures must be supported by substantial evidence of some kind." Id.

The first problem with Cure Land's argument is that the agency did not remove the target zone component of the proposed amendment as a mitigation measure. We agree with the district court's assessment that the "EA is clear that no significant impacts on the human environment would result from the proposed Amendment even if it included the Target Zone, which obviates the need to mitigate any environmental impacts, whether by excluding the Target Zone or otherwise." AR 2179-80. The second problem with Cure Land's argument is that, as discussed supra, the FONSI does not find that the amendment with the target zone would result in negative environmental impacts. As a result, Cure Land's argument that such a finding would not be supported by substantial evidence is beside the point. Removal of the target zone component was not a mitigation measure, let alone an improper one.

16

**F. Basis for Decision**

Cure Land further contends that the agency's decision and analysis were based on improper considerations. Specifically, Cure Land argues that the agency removed the target zone out of bias, in subjective bad faith, and/or in response to political pressure. Those assertions find no support in the record. The cases Cure Land cites on those topics are therefore inapposite. See Latecoere Int'l, Inc. v. U.S. Dept. of Navy, 19 F.3d 1342 (11th Cir. 1994); D.C. Federation of Civic Ass'ns v. Volpe, 459 F.2d 1231 (D.C. Cir. 1972).

Cure Land also argues that, when (allegedly) finding that the amendment with the target zone would result in significant negative environmental impacts, the agency wrongly relied on the public's perception that changing the target zone's enrollment requirements was inequitable. It is well-settled that socioeconomic impacts, standing alone, do not constitute significant environmental impacts cognizable under NEPA. See, e.g., 40 C.F.R. § 1508.14 ("[E]conomic or social effects are not intended by themselves to require preparation of an environmental impact statement."); Image of Greater San Antonio v. Brown, 570 F.2d 517, 522 (5th Cir. 1978) (same); Como-Falcon Cmty. Coal., Inc. v. U.S. Dep't of Labor, 609 F.2d 342, 346 (8th Cir. 1979) (same).[10]

Yet again, the primary flaw in Cure Land's argument is that, as discussed supra, the agency did not, in fact, find that the amendment would result in significant negative

---

[10] However, "whe[n] an action will have a primary impact on the natural environment, secondary socio-economic effects may also be considered." Brown, 570 F.2d at 522; see also 40 C.F.R. § 1508.14.

17

environmental impacts, whether predicated on socioeconomic concerns or otherwise.

Moreover, the plain language of the NEPA documents belies Cure Land's contention

that the agency conflated socioeconomic and environmental concerns. Specifically,

when addressing the public's opposition to creation of the target zone, the FONSI

explained,

> Additional public involvement measures were taken for this action given the high public interest in the action. Comments received throughout the project did not indicate significant concern with the environmental analysis but rather opposition to the proposed incentive payments and eligibility requirements described in the proposed Amendment to the Republican River [conservation program].

AR 499. Similarly, the EA found that comments regarding the perceived inequity of

the target zone fell outside the scope of that environmental document. Therefore,

although the agency noted the public's opposition to the target zone, it properly

declined to rely on those socioeconomic concerns when evaluating the environmental

impacts of the amendment.

To the extent that Cure Land contends NEPA prevents the agency from ultimately

choosing to proceed with a particular version of the amendment for socioeconomic—

rather than environmental—considerations, precedent dictates otherwise.

Agencies "are not required to elevate environmental concerns over other valid

concerns."[11] Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152,

---

[11] Nor are agencies required ultimately to authorize the full scope of each project that they consider in an environmental assessment or impact statement. See Defs. of Wildlife v. N. C. Dep't of Transp., 762 F.3d 374, 397 (4th Cir. 2014) ("[Agencies] are not required to approve the entire Project in a single Record of Decision so long as their NEPA documents adequately analyze and disclose the impacts of the entire Project

1162-63 (10th Cir. 2002), as modified on reh'g, 319 F.3d 1207 (10th Cir. 2003); see also Robertson, 490 U.S. at 350 ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."). "So long as the record demonstrates that the agencies in question followed the NEPA procedures. . . , the court will not second-guess the wisdom of the ultimate decision." Utahns for Better Transp., 305 F.3d at 1163; see Friends of Marolt Park, 382 F.3d at 1092 (holding that an agency "was not required to select the preferred option indicated in the final [environmental impact statement]" when the record showed that public support for the non-preferred alternative was higher).

Cure Land does not contend that the agency failed to take a "hard look," Utahns, 305 F.3d at 1163, at the amendment's impacts on the natural environment, and has failed to show that the agency's environmental analysis was otherwise flawed. Because NEPA's procedural requirements are met, our inquiry ends here. See Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 228 (1980) ("[T]here is no doubt that [the agency] considered the environmental consequences of its decision . . . . NEPA requires no more.").

**G. Notice and Comment**

Finally, Cure Land contends the agency violated NEPA's notice and comment requirements because it did not present the amendment without the target zone as a

_____

. . . ."); Defs. of Wildlife v. U.S. Dep't of Navy, 733 F.3d 1106, 1116 (11th Cir. 2013) ("Appellants have presented no authority mandating that an agency must authorize all stages of a project in one [record of decision].").

19

separate alternative in the EA. However, when preparing an EA, an agency must only "involve . . . the public . . . to the extent practicable."[12] 40 C.F.R. § 1501.4(b). An agency is afforded "considerable discretion to decide the extent to which such public involvement is 'practicable.'" WildEarth Guardians v. U.S. Fish & Wildlife Serv., 784 F.3d 677, 698 (10th Cir. 2015) (quotation omitted).

The record shows the public was given ample opportunity to comment on all components of the proposed amendment. See AR 588-731 (draft EA made available to the public discussing each component of the proposed amendment), 1296-97 (explanation of the public meeting and the thirty-day comment period made available to the public), 572-85 (EA responding to each public comment)). "[N]otice was presumably sufficient since the comments themselves brought the issue [of removing the target zone] up." WildEarth Guardians, 784 F.3d at 699. The agency "acted well within the confines of [its] substantial discretion" when it approved all but one component of the program expansion on which it had sought public comment. Id.; see Flowers, 359 F.3d at 1279 (upholding a FONSI where the public had not had an opportunity to comment on the alternatives considered by the agency).

### III.    CONCLUSION

For the foregoing reasons, we AFFIRM the district court.

---

[12] Similarly, an agency is only required to give the public notice and an opportunity to comment on a FONSI in two limited situations, neither of which is present here. See 40 C.F.R. § 1501.4(e).