**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 13, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

COALITION OF CONCERNED
CITIZENS TO MAKE ART SMART;
2706 CENTRAL AVENUE LLC, a
New Mexico Limited Liability
Company; FOX PLAZA LLC, a New
Mexico Limited Liability Company;
JULIE STEPHENS; JEAN
BERNSTEIN; MARC BERNSTEIN,

     Plaintiffs - Appellants,

and

MARIA BAUTISTA; STELLA
PADILLA; JOSEPH AGUIRRE;
MILDRED "MIMI" LOPEZ;
ARMOND CHAKARIAN; MAX
MACAULEY; YARA ESTRADA; LA
MICHOACANA RESTAURANT;
WESTERN VIEW RESTAURANT;
ALBUQUERQUE BARBERSHOP;
MIXX RESTAURANT; G-MART
CONVENIENCE STORE; RAIN
TUNNEL CAR SPA; H & D TIRE
SHOP; TURBO TIRESHOP; ROUTE
66 APARTMENTS; EL CHANTE:
CASA DE CULTURA,

     Plaintiffs,

v.                                                    No. 16-2192

FEDERAL TRANSIT
ADMINISTRATION OF U.S.
DEPARTMENT OF
TRANSPORTATION, an Agency of

the United States; ANTHONY FOXX, Secretary of the United States Department of Transportation, in his official capacity; ROBERT C. PATRICK, Regional Director for Region VI of the Federal Transit Administration, in his official capacity; DONALD R. KOSKI, Director, Planning and Program Development of the Federal Transit Administration, in his official capacity; CITY OF ALBUQUERQUE, New Mexico, a municipal corporation; RICHARD J. BERRY, Mayor of Albuquerque, in his official capacity; BRUCE RIZZIERI, Director, ABQ-Ride Transit, in his official capacity,

     Defendants  -Appellees,

and

ROBERT J. PERRY; MICHAEL RIORDAN; ALBUQUERQUE CITY COUNCIL; ISAAC BENTON; KENNETH SANCHEZ; PAT DAVIS; KLARISSA PENA; BRAD WINTER; DAN LEWIS; DIANE G. GIBSON; TRUDY JONES; DON HARRIS, in their official capacities as Albuquerque City Councilors; FEDERAL TRANSPORTATION ADMINISTRATION; THERESE MCMILLAN, Acting Administrator of the Federal Transportation Administration,

     Defendants.

2

John W. Boyd, of Freedman Boyd Hollander Goldberg Urias & Ward, P.A. (Yolanda R. Gallegos, of Gallegos Legal Group, with him on the briefs), Albuquerque, New Mexico, for Plaintiffs-Appellants.

J. David Gunter II, Attorney, Environment and Natural Resources Division, U.S. Department of Justice (John C. Cruden, Assistant Attorney General; Tyler L. Burgess, Attorney, Environment and Natural Resources Division, U.S. Department of Justice; and Andrew A. Smith, Attorney, Environment and Natural Resources Division, U.S. Department of Justice, with him on the brief), Washington, D.C., for Federal Transit Administration, Anthony Foxx, Robert C. Patrick, and Donald Koski, Defendants-Appellees.

Marla L. Lien, of Kaplan Kirsch & Rockwell LLP, Denver, Colorado (Jessica M. Hernandez, City Attorney, and Kristin J. Dalton, Assistant City Attorney, Albuquerque, New Mexico; Lori Potter, Attorney, and W. Eric Pilsk, Attorney, of Kaplan Kirsch & Rockwell LLP, Denver, Colorado, with her on the brief), for City of Albuquerque, Mayor Richard J. Berry, and Bruce Rizzieri, Defendants-Appellees.

Before **TYMKOVICH,** Chief Judge, **BALDOCK** and **BRISCOE,** Circuit Judges.

**BRISCOE**, Circuit Judge.

Plaintiffs, a group of entities and individuals that own businesses or real property located on Central Avenue in Albuquerque, New Mexico, filed this action seeking to enjoin the City of Albuquerque (the City) from proceeding with construction of a rapid transit bus system along Central Avenue. Plaintiffs claim, in pertinent part, that the City and the Federal Transit Administration, from whom

3

the City seeks federal funding for the project, violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, and the National Historic Preservation Act, 54 U.S.C. §§ 300101 *et seq.*, in the course of planning the project. The district court denied plaintiffs' request for a preliminary injunction. Plaintiffs have now filed an interlocutory appeal challenging that ruling. Exercising jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), we affirm.

I

*Central Avenue and its current public transit system*

Central Avenue in Albuquerque, New Mexico, is a major east-west street that was part of U.S. Route 66 until that highway was decommissioned in 1985. Currently, "[t]he Central Avenue corridor provides direct transit and vehicular access to two major employment/activity centers including the University of New Mexico (UNM) and the Albuquerque Downtown/Central Business District area." App., Vol. 1 at 70–71. UNM's central campus "is bounded on the south by Central Avenue." Id. at 71. "Central Avenue [also] passes through the heart of the Downtown area and is within one to four blocks of almost every major building in the Central Business District." Id. "[T]wo major entertainment districts," Downtown and an area known as "Nob Hill," are "located on Central Avenue and are popular destinations for tourists and locals." Id.

Albuquerque's bus system, known as ABQ RIDE, currently offers three transit routes that "serve Central Avenue: Route 66, Route 766 (Red Line), and

4

Route 777 (Green Line)." Id. at 70. Routes 766 and 777 are part of what is known as "ABQ RIDE's Rapid Ride system." Id. These two routes operate in mixed-flow lanes, meaning that the lanes serve both ABQ Ride buses as well as other types of vehicles. "Central Avenue is ABQ Ride's highest ridership corridor." Id.

*The ART Project*

In order "to improve transit service along Central Avenue, and to improve access to major activity and employment centers located" along Central Avenue, the City has proposed what is known as the "Albuquerque Rapid Transit (ART) [P]roject." Id. "The ART system [will] include[] the construction of a rapid vehicle guideway within the street median [on Central Avenue] and stations spaced at ½ to 1 mile intervals." Id. at 71. "All proposed construction [will be] within the operational right-of-way of Central Avenue," id., with the exception of "narrow slivers of property at major intersections" that the City intends to acquire, id. at 75. "The traffic signal system for Central Avenue within the project limits will be modified to provide traffic signal priority for ART vehicles." Id. at 72.

ART buses will, depending upon the particular section of Central Avenue, operate either in mixed-flow traffic (meaning they will utilize the same lanes as other vehicles) or in their own exclusive lanes. Some sections of Central Avenue will feature two exclusive rapid vehicle lanes, while other sections will feature

5

one bi-directional rapid vehicle lane. For example, "exclusive lanes for rapid vehicles will be constructed from Coors Boulevard to Louisiana Boulevard — a distance of approximately 8.75 miles." Id. at 70. These rapid vehicle routes will replace Routes 766 and 777.

In order to install the ART system, the City plans to make a number of changes to Central Avenue. These include, but are not limited to:

> • milling, overlaying, and restriping throughout the project construction limits;
>
> • removing some of the existing medians to accommodate rapid vehicle lanes;
>
> • reconstructing and reconfiguring landscaped medians at several locations; and
>
> • relocating existing street lights from medians to curb side in certain locations.

Id. at 73.

"Traffic will be affected by three aspects of the . . . project." Id. at 81. These include: (1) "the reduction of general purpose traffic lanes in" certain segments of Central Avenue; (2) "changes to the traffic signal system on Central Avenue to integrate a signal priority system for preferential rapid vehicle operations"; and (3) "median closures that will shift left-turns and U-turns at existing median openings to signalized intersections." Id.

Thus, "[t]raffic capacity will be reduced in some segments" of Central Avenue "as a result of traffic lane reductions." Id. at 75. Further, because "[t]he

6

rapid vehicle lanes will have limited access to other vehicles, . . . access to the businesses and other development on Central Avenue will be less than currently exists." Id. The City alleges, however, that "[r]easonable access to all businesses will be maintained with left turn/U-turn access provided at signalized intersections." Id. "In general, left turn/U-turn access [will be] spaced approximately every one quarter mile from Coors Boulevard to Louisiana Boulevard." Id.

The ART project will pass "through four historic districts." Id. at 86. "The stations in these districts have been designed without canopies to avoid any visually prominent features." Id. "There are [also] 127 historic properties within the project [area] that are listed, eligible for listing, or have an undetermined eligibility to the [National Register of Historic Places]." Id. "No property from any of the historic buildings will be directly impacted or altered by the project." Id.

*The City's request for a Small Starts grant from FTA*

The Federal Transit Administration (FTA), a federal agency that is a division of the United States Department of Transportation (DOT), administers the "Small Starts" program as part of its Capital Investment Grant Program, which supports locally planned transit projects. See 49 U.S.C. § 5309(b); 49 C.F.R. § 611.101. By statute, Congress has encouraged the use of "small start project[s] utilizing buses . . . in a defined corridor . . . that emulate the services

7

provided by rail fixed guideway public transportation systems." 49 U.S.C. §
5309(a)(3), (h).

There is conflicting information in the record concerning whether the City
has submitted a Small Starts grant application to the FTA. According to the City,
it did so on July 13, 2015, and its alleged purpose in doing so was to seek
approximately $69,000,000 in Small Starts funds. Such funding, according to the
City, would comprise approximately 55% of the estimated construction cost of
$126.2 million. In contrast, the FTA asserts that the City has yet to file a formal
Small Starts grant application. FTA Aplee. Br. at 13 n.2. Consequently, the FTA
asserts, it "has not yet made a final decision whether to award a grant" to the City
for the ART Project. Id.

*The City's and FTA's NHPA analysis*

Federal funding for the ART Project, should it occur, would subject the
ART Project to analysis under the National Historic Preservation Act (NHPA), 54
U.S.C. § 300101 *et seq.* Specifically, Section 106 of NHPA imposes a procedural
requirement that, before approving a "federally assisted undertaking," a federal
agency "shall take into account the effect of the undertaking on any historic
property." Id. § 306108. A "historic property" is any property that is "in, or
eligible for inclusion in," the National Register of Historic Places. Id. § 300308.
The agency must consult with the relevant State Historic Preservation Officer
(SHPO) to identify those properties, identify any adverse effects that a proposed

8

project might have on them, and then evaluate modifications to the project that would avoid, minimize, or mitigate those adverse effects to the SHPO's satisfaction. See 36 C.F.R. §§ 800.3–800.6; Valley Cmty. Pres. Comm'n v. Mineta, 373 F.3d 1078, 1085 (10th Cir. 2004).

The City, aware that it intended at some point to seek federal funding for the ART Project, began the SHPO consultation process on June 4, 2014. The City was assisted in this process by Jeffrey Fredine, an environmental planner, historian, and cultural resource specialist who worked for a private consulting firm. On June 4, 2014, the City met with employees from the New Mexico Historic Preservation Department (HPD), which acts as the SHPO for purposes of NHPA. "That meeting included a discussion of the nature and extent of [the ART] Project and consideration of detailed drawings of ART, including changed lane configurations, streetscape improvements, and station construction, to understand what impact [the] ART [Project] would have." App., Vol. 4 at 538. The SHPO "suggested that a variable [area of potential effect (APE)] should be defined around each proposed station site based on the level of historic integrity at each location and the amount of previous documentation that exist[ed] for each area." Id., Vol. 12 at 1705.

On June 14, 2014, the City and the SHPO "conducted field reconnaissance of the entire [ART] [P]roject area," id., Vol. 12 at 1705, in order "to assess first-hand how ART might affect historic resources," id., Vol. 4 at 538. The City and

9

SHPO determined that the ART Project would not physically touch or use any historic resource. But the SHPO nevertheless "identified eight areas of potential concern that could constitute or contribute to an historic district or cultural landscape." Id., Vol. 12 at 1705. The City and the FTA ultimately "defined a variable APE for each specific [ART] station location." Id., Vol. 12 at 1705. "Generally, the APE include[d] 300 feet on either side of intersections within the eight areas identified as having the most historic integrity within the [ART] [P]roject area, and 100 feet on either side of the intersections outside of these areas." Id. at 1705–06. "The potential for possible effects to be considered" in those areas "would be in [the] visual impacts at the station locations and how that might affect the historic setting of a property." Id., Vol. 24 at 3049–50. The SHPO ultimately agreed that this was the appropriate APE.

The City then "conducted a detailed review of the APE to identify historic and cultural resources." Id., Vol. 4 at 538. This review "process identified 138 historic or potentially historic properties in the APE that could be affected by [the] ART [Project]." Id. at 538–39. The City's study culminated in a March 12, 2015 "Cultural Resources Inventory." Id., Vol. 13 at 1731. On April 6, 2015, the FTA transmitted the Cultural Resources Inventory to the SHPO and asked the SHPO "to concur in [the] FTA's finding that [the] ART [Project] would not have any adverse effect on any historic resource, primarily due to the lack of physical use on any historic property and limited scope of construction." Id., Vol. 4 at

10

539.

On April 8, 2015, the SHPO refused to concur, "citing concerns over the visual impact of three ART [Project] stations on surrounding historic districts." Id. The FTA, the City, and the SHPO subsequently "met and discussed the . . . SHPO's concerns regarding visual impacts." Id. The SHPO "made clear that its concerns were limited to the visual impact of the canopies over three specific stations — Rio Grande, 15th Street, and Walter Street — because of the historic significance and integrity of the surrounding neighborhood." Id.

On June 25, 2015, the FTA sent an "Addendum Cultural Resources Inventory" to the SHPO that "memorialized the commitment of the City and [the] FTA to eliminate the canopies at the three stations in response to address [the SHPO's] concerns." Id. "The letter included renderings of the redesigned stations." Id.

On July 7, 2015, the SHPO "issued a letter concurring with [the] FTA that [the] ART [Project] would not have any adverse effects on any historic or cultural resources." Id.

*The ART Project - Categorical Exclusion*

The nature and amount of the Small Starts grant that the City is purportedly seeking from the FTA also subjects the ART Project to analysis under the National Environmental Policy Act (NEPA). More specifically, the FTA, before awarding any grant money, is required to assess the environmental impacts of the

11

ART Project, consider alternatives with less environmental impact, and evaluate whether the benefits of the project would exceed its impact on the environment.

On or about August 17, 2015, the City applied to the FTA for a "documented exception from the requirement that the City or the FTA prepare an environmental impact statement (EIS) or environmental assessment (EA). In support of its application, the City prepared and submitted a "[Categorical Exclusion] Worksheet," which was, in essence, "an extensive, 1,174-page environmental review package." Id. at 536.

On August 26, 2015, the FTA sent a letter to the City informing it that the FTA had completed its review of the City's application and "ha[d] determined that the proposed ART [P]roject me[t] the criteria for Categorical Exclusion [(CE)] in accordance with 23 CFR Part 771.118(d)." Id., Vol. 1 at 112. The FTA also confirmed that it had "determine[d] the project w[ould] result in a '*no adverse effect*' on historic properties" under NHPA, and it noted that the "SHPO concurred with this determination on July 7, 2015." Id.

*The FTA's Letter of No Prejudice*

As noted, the FTA alleges that it "has not yet made a final decision whether to award a grant" to the City for the ART Project. FTA Aplee. Br. at 13 n.2. Nevertheless, on July 18, 2016, the FTA issued to the City a "Letter of No Prejudice" (LONP). Id. at 866. "The LONP provides the opportunity for the City immediately [to] spend up to $59 million dollars that is eligible for

12

reimbursement by the FTA for the ART [P]roject." Id.

*The plaintiffs*

The plaintiffs in this action, all of whom own businesses or property located on Central Avenue in Albuquerque, New Mexico, include the following:

• The Coalition of Concerned Citizens to Make Art Smart is an unincorporated association that was formed to "improve bus transit along Central Avenue [in Albuquerque, New Mexico,] without harming the businesses, shops, restaurants, neighborhoods and property values and to prevent the ART project from going forward as designed." App., Vol. 1 at 42–43.

• 2706 Central Ave., LLC, is a New Mexico limited liability company that owns property at the corner of Central Avenue and Girard Street in Albuquerque. Id. at 43.

• Fox Plaza, LLC, is New Mexico limited liability company that owns a shopping plaza at the southwest corner of Central Avenue and Pennsylvania Street in Albuquerque. Id.

• Julie Stephens owns and operates a consulting firm located in the Nob Hill area of Albuquerque in the Central Avenue corridor. Id.

• Jean and Marc Bernstein are the owners of Flying Star Restaurants. Id. One of their restaurants is located on the south side of Central Avenue in the Nob Hill area. Id.

*The complaint*

On April 4, 2016, plaintiffs filed a complaint for declaratory, statutory, and injunctive relief against the FTA, the Regional Director for Region VI of the FTA (Robert Patrick), the Director of Planning and Program Development of the FTA (Donald Koski), the City, the mayor of the City (Richard Berry), and the Director

13

of ABQ-RIDE Transit (Bruce Rizzieri).[1]  Count I of the complaint sought review under the Administrative Procedure Act (APA) of the FTA's decision under NEPA to grant a CE in connection with the ART Project.  Count II of the complaint alleged that the FTA and the City failed to properly consider and evaluate the impact the ART Project "would have on the historical integrity of Route 66 and its adjacent historic resources," and that the FTA and the City thereby violated . . . [NHPA]."  Id. at 63.  Count III of the complaint alleged that the City violated the New Mexico Prehistoric and Historic Sites Preservation Act by failing to "properly consider and evaluate the impact that the ART project would have on the historical integrity of Route 66 itself and the historic sites adjacent to it."  Id. at 64.  Count IV of the complaint alleged that the City violated its own Complete Streets Ordinance because "[t]he ART [P]roject does not balance the need to move vehicles efficiently with the other context sensitive outcomes the City was required to consider" under the ordinance.  Id. at 66.

Plaintiffs allege in their complaint that the ART Project will have a significant impact on both travel patterns and the human environment along Central Avenue.  Id. at 54.  In particular, plaintiffs allege that the ART project

---

[1] On that same date, a separate group of Albuquerque citizens (often referred to in the pleadings as the "Bautista plaintiffs") filed suit in New Mexico state court against the City, various City officials, the DOT, the FTA, and federal officials seeking to enjoin the ART Project.  That complaint was removed to federal district court, but is not part of this appeal.

14

will have the following detrimental impacts:

• The reduction of all eastbound and westbound traffic to single lanes "will significantly disrupt and alter traffic patterns throughout the Central Avenue corridor . . . because those single lanes will become choked, forcing traffic . . . into adjacent residential neighborhoods . . . . The result will be not just to snarl and divert traffic but to alter the quiet, residential character of neighborhoods adjacent to Central Avenue." Id. at 48.

• "[E]xisting 'local' buses that must travel along the remaining single lanes of east and west-bound non-ART traffic will not have space to move out of the lane of traffic when they receive or discharge passengers, resulting in what is likely to be a 'blockade' of traffic by the local buses." Id. at 48–49.

• "The redirection of traffic by the clogging of single lanes will direct traffic away from the restaurants, shops and businesses on Central that depend on vehicle access and presence in the neighborhood for their financial survival." Id. at 49.

• The "[e]limination of most left turns on Central Avenue will necessarily eliminate convenient access to businesses, shops and restaurants along Central, reducing customer volume and endangering the success of those businesses, shops and restaurants and the jobs of their employees." Id.

• The elimination of most left turns on Central Avenue will also "forc[e] many delivery trucks and vans into residential areas to 'circle' back to delivery locations that they have had to pass." Id.

• "ART's design for dealing with the elimination of most left turns is to encourage U-turns at the remaining left turns. This is not only dangerous but will hopelessly congest the intersections where the U-Turns must take place and will further force traffic into the adjoining residential neighborhoods." Id. at 49–50;

• ART's design "to use 'yellow lines' to indicate that its two dedicated lanes are off-limits to other vehicles . . . is unrealistic" and "will create an extraordinarily unsafe condition, particularly for drivers who approach Central from a side street and do not

15

understand that they are forbidden to cross the yellow lines in order to cross Central to proceed in the direction they want to go." Id. at 50.

• ART's design "will attempt to force pedestrians to cross Central [Avenue] at only three or four block intervals, thereby increasing jaywalking in areas where the median no longer exists and where 'express' ART buses will be passing in either direction along the two dedicated lanes in the center of Central. This will significantly magnify the danger of accidents and pedestrian injuries or fatalities." Id. at 49.

• ART's inclusion of "six 'midblock' stations . . . located in the middle of Central Avenue" will "forc[e] pedestrians to cross half-way across Central and then walk the length of the station to reach the other 'half' of the cross-walk. It is probable that many pedestrians will simply jay-walk the second half of their crossing rather than walking the length of the station, thereby endangering themselves." Id. at 50.

*Motion for preliminary injunction*

On June 9, 2016, the plaintiffs filed a motion for preliminary injunction asking the district court "to preliminarily enjoin" the City and the FTA "from taking any actions in furtherance of" the ART Project. Id. at 124. In support of their motion, plaintiffs argued that they were substantially likely to succeed on the merits of their claims that (1) the FTA arbitrarily and capriciously granted the City a CE for the ART Project, (2) the FTA's grant of a CE to the City was in violation of NHPA, (3) the ART Project violates the New Mexico Prehistoric and Historic Sites Preservation Act, and (4) the ART Project violates the City's own Complete Streets ordinance. Id. at 176.

The district court held a three-day evidentiary hearing on the plaintiffs'

16

motion from July 27 to 29, 2016.[2]  During that hearing, the plaintiffs "focused

[exclusively] on the[ir] NEPA and NHPA claims."  Id. at 1054.

On July 29, 2016, the district court issued a written memorandum opinion

and order denying plaintiffs' motion for preliminary injunction.  In doing so, the

district court concluded that the FTA's CE and NHPA determinations were not

arbitrary or capricious and that, consequently, the plaintiffs had failed to establish

a substantial likelihood of success on the merits of their claims that the FTA

violated NEPA and NHPA.  The district court further concluded that plaintiffs

had failed to establish irreparable harm, noting "that the ART lanes could be

redesignated as general use lanes without much trouble" and that plaintiffs'

alleged economic injuries would be "compensable with monetary damages."  Id.,

Vol. 7 at 1063.  Relatedly, the district court concluded that "the evidence

show[ed] any harm w[ould] also not be 'certain or great,'" and that plaintiffs

failed to "provide[] any specific numbers or hard projections . . . to show how

much business will be lost."  Id.  In addition, the district court concluded that the

balance of equities and the public interest weighed in favor of not granting a

preliminary injunction.  In that regard, the district court noted that "not allowing

ART to go forward w[ould] keep the City from building a project to revitalize the

area and address pedestrian safety and improve transit efficiency," and would also

---

[2] The hearing also simultaneously addressed a similar motion for preliminary injunction filed by the Bautista plaintiffs in their action.

17

"lead to increased construction costs." Id. at 1065. Finally, the district court concluded that "[a] preliminary injunction, on the whole, would be adverse to the public interest." Id. at 1066.

## *Notice of appeal*

On July 31, 2016, plaintiffs filed a notice of appeal from the district court's memorandum opinion and order denying their motion for preliminary injunction.

## II

Plaintiffs raise six separate issues on appeal. Two of those issues deal with evidentiary rulings made by the district court in the course of denying plaintiffs' motion for preliminary injunction. The remaining four issues address the merits of the district court's order denying the motion for preliminary injunction. As discussed below, we conclude that all of these issues lack merit.

## *Standards of review*

"We review the denial of a preliminary injunction for abuse of discretion." Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1128 (10th Cir. 2013), aff'd sub nom Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751 (2014). "An abuse of discretion occurs where a decision is premised on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." Fish v. Kobach, 840 F.3d 710, —, 2016 WL 6093990, at *8 (10th Cir. 2016) (quotation marks omitted). "Thus, we review the district court's factual findings for clear error and its conclusions of law de novo." Id.

18

As for the evidentiary rulings made by the district court in connection with denying the plaintiffs' motion for preliminary injunction, we apply an abuse of discretion standard. See Monfore v. Phillips, 778 F.3d 849, 854 (10th Cir. 2015) ("Appellate courts review evidentiary complaints only for abuse of discretion."); Hancock v. Am. Tel. and Tel. Co., 701 F.3d 1248, 1262 (10th Cir. 2012) ("We review a district court's ruling on . . . a motion to strike [an affidavit or declaration] for abuse of discretion.").

*The two evidentiary challenges*

In Issues II and V of their opening brief, plaintiffs challenge evidentiary rulings made by the district court in the course of ruling on their motion for preliminary injunction. Specifically, in Issue II, plaintiffs argue that the district court erred in striking their expert and lay declarations as inadmissible opinion evidence regarding the ART Project's environmental impacts. In Issue V, plaintiffs argue that the district court erred in excluding as irrelevant what they refer to as the "de Garmo" email. For the reasons discussed below, we conclude that the district court did not abuse its discretion in either regard.

*1) Striking of plaintiffs' expert and lay declarations*

Prior to the evidentiary hearing on plaintiffs' motion for preliminary injunction, the federal defendants moved to strike both lay and expert declarations that were submitted by plaintiffs in connection with their motion.

On July 15, 2016, the district court issued a written memorandum opinion

19

and order granting the motion to strike the declarations to the extent they went beyond issues of standing and personal expressions of irreparable harm. In doing so, the district noted that its "role in this lawsuit [wa]s to review the FTA's decision to grant the CE application based upon the materials before the FTA at the time of its decision and upon acceptable extra-record materials, if any." App., Vol. 6 at 840. With respect to the lay declarations submitted by plaintiffs, the district court noted that plaintiffs were arguing that such declarations "provide[d], through common sense, evidence that the FTA failed to consider ART's impact on businesses and adjoining neighborhoods." Id. at 841. The district court concluded, however, that "when it comes to a multi-faceted and complex project like the ART [P]roject, . . . the proposed 'common sense' standard [was] unhelpful," as well as "ambiguous and subjective at best." Id. With respect to the two expert opinions challenged by the federal defendants (those of Dr. Gregory Rowangould and Paul Lusk), the district court noted that "the FTA was not required to rely on its own experts, but instead could rely on the City's experts whose reports are included in the Preliminary Administrative Record." Id. Further, the district court noted that "Rowangould and Lusk, in their declarations, attack[ed] the reliability of the City's methodology" and thus "disagree[d] with the City's experts." Id. at 841–42. "Such a disagreement between experts on the correct methodology to utilize," the district court concluded, "does not provide a sufficient reason to allow Rowangould and Lusk's

20

extra-record declarations." Id. at 842.

On appeal, plaintiffs argue that it was "clear error" for the district court to strike these declarations. Aplt. Br. at 34. As noted, however, the district court's decision is not reviewed for clear error, but rather for an abuse of discretion.

In any event, plaintiffs argue that our decision in Lee v. Air Force, 354 F.3d 1229 (10th Cir. 2004), supports their submission of the declarations and undercuts the district court's decision to strike those declarations. Plaintiffs are wrong, however. In Lee, we held that in a NEPA-based action, "judicial review of agency action is normally restricted to the administrative record," and that "consideration of extra-record materials is appropriate [only] in 'extremely limited' circumstances, such as where the agency ignored relevant factors it should have considered or considered factors left out of the formal record." Id. at 1242. To be sure, plaintiffs in this case assert that their declarations "attempted to show, through common sense (Coalition plaintiffs) and expert opinion (Rowangould and Lusk) that there were numerous environmental impacts that ART would have that the FTA had failed to consider." Aplt. Br. at 33. But plaintiffs make no attempt in their appellate brief to identify what those impacts are.

In its order striking the declarations, the district court noted that "the City's reports in the Preliminary Administrative Record address[ed] many of the factors . . . Plaintiffs assert[ed] the FTA did not consider, albeit in a manner which . . .

21

Plaintiffs disagree[d] with." App., Vol. 6 at 840. These factors, the district court

noted, included "impacts on traffic, access to businesses, pedestrian safety, bus

ridership, and storm water issues as well as consideration of public comment."

Id. The district court "note[d] that the Preliminary Administrative Record d[id]

not appear to contain a study or analysis of the economic impact of ART on

businesses." Id. Nevertheless, the district court concluded that "the evidence in

the [lay] declarations concerning a negative impact on businesses [wa]s

unsubstantiated and, therefore, not helpful to the Court." Id. at 840–41. Notably,

plaintiffs make no reference to these conclusions at all, and therefore fail to

demonstrate that the district court abused its discretion in striking the lay

declarations.

As for the two expert declarations, the district court, as noted, concluded

that they simply "disagree[d] with the City's experts" and thus were not properly

considered. Id. at 842. Again, plaintiffs make no attempt to address this

rationale, let alone demonstrate that the district court abused its discretion in

striking the expert declarations.

In sum, plaintiffs have failed to establish that the district court abused its

discretion in striking the lay or expert declarations.

*2) Exclusion of the de Garmo email*

At the evidentiary hearing, plaintiffs sought to admit an email message that

Andrew de Garmo, the head of planning for the City's transit department, sent to

22

other ART Project officials on February 19, 2014. The email message read, in pertinent part: "I've been wrong on a crucial point, and I apologize for muddying the issues. A BRT project does <u>not</u> need to have any dedicated lanes to qualify for <u>Small</u> Starts funding; it only needs to have >50% dedicated lanes to qualify for <u>New</u> Starts funding." App., Vol. 21 at 2643. The district court excluded the email message on the grounds that it was not "sufficiently probative" under Federal Rule of Evidence 403. App., Vol. 25 at 3194–95.

Plaintiffs argue on appeal that "the District Court's failure to admit or consider the email was clear error." Aplt. Br. at 41. As we have noted, however, the district court's evidentiary ruling is not subject to review for clear error, but rather for an abuse of discretion, and plaintiffs make no attempt to argue that the district court abused its discretion.

In any event, having reviewed the record, we conclude that the district court did not abuse its discretion in excluding the email message. Although plaintiffs argue that the message "established the truth of the design being unnecessary" and "went directly to the issues of balance of harms and the public's interest in the event of an injunction," we conclude that the email message was irrelevant to any of the preliminary injunction factors considered by the district court. Aplt. Br. at 41. To begin with, the email message had no relevance to the question of whether the FTA properly complied with NEPA or NHPA. As for the balance of harms and public interest factors (which will be discussed in greater

23

detail below), plaintiffs make no attempt to explain precisely how de Garmo's email message could be relevant. At best, the message suggests that a key design feature of the ART Project — i.e., dedicated bus lanes down the median of Central Avenue — was unnecessary for the City to obtain federal funding for the ART Project. But it does not otherwise undercut the reasons forwarded by the City for designing and implementing the ART Project in the first place.

*The substantive challenges*

The remaining four issues raised by plaintiffs on appeal (Issues I, III, IV and VI) are substantive challenges to the district court's decision to deny their motion for preliminary injunction. These four issues, all of which lack merit, will be addressed in the context of the standards outlined in Federal Rule of Civil Procedure 65(a) for the issuance of preliminary injunctions.

Rule 65(a) authorizes district courts to issue preliminary injunctions. Generally speaking, a plaintiff "seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

*Likelihood of success on the merits*

"The very purpose of an injunction under Rule 65(a) is to give temporary relief based on a preliminary estimate of the strength of the plaintiff's suit, prior

24

to the resolution at trial of the factual disputes and difficulties presented by the case." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2948.3, at 213–14 (2013). Although "[t]he courts use a bewildering variety of formulations of the need for showing some likelihood of success," id. at 197, "[a]ll courts agree that plaintiff must present a prima facie case but need not show a certainty of winning." Id. at 201.

As we have noted, the plaintiffs ultimately based their motion for preliminary injunction on two of the claims alleged in their complaint: (1) the claim in Count I that the FTA acted arbitrarily and capriciously in granting a CE in connection with the ART Project; and (2) the claim in Count II that the FTA violated NHPA by failing to properly consider and evaluate the impact of the ART Project on the historical integrity of Route 66 and its adjacent historic resources. Both of these claims constitute challenges to final agency action under the APA.

*1) The APA*

Because neither NEPA nor NHPA "provide a private right of action, we review" the two FTA decisions as "final agency action[s] under the" APA. Utah Env't Cong. v. Russell, 518 F.3d 817, 823 (10th Cir. 2008). "When courts consider such challenges, an agency's decision is entitled to a presumption of regularity, and the challenger bears the burden of persuasion." San Juan Citizens All. v. Stiles, 654 F.3d 1038, 1045 (10th Cir. 2011) (citation omitted). But we

25

"can set aside an agency decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Id. (quoting 5 U.S.C. § 706(2)(A)). An agency's decision will be deemed arbitrary and capricious "'if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment.'" Id. (quoting New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 704 (10th Cir. 2009)).

*2) The NEPA-based claim*

NEPA "requires federal agencies . . . to analyze environmental consequences before initiating actions that potentially affect the environment." Utah Env't Cong. v. D. Bosworth, 443 F.3d 732, 735–36 (10th Cir. 2006). Notably, NEPA "does not mandate particular results," but rather "imposes only procedural requirements to ensure that [a federal] agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." Winter, 555 U.S. at 23 (quotation marks omitted). Specifically, in conducting its environmental analysis under NEPA, a federal agency "must prepare one of the following: (1) an environmental impact statement [(EIS)], (2) an environmental assessment [(EA)], or (3) a categorical

26

exclusion [(CE)]." Id. at 736.

The "most rigorous" of these three options is the EIS. Id. An EIS "is required if a proposed action will 'significantly affect[] the quality of the human environment.'" Id. (quoting 42 U.S.C. § 4332(C)). "If an agency is uncertain whether the proposed action will significantly affect the environment, it may prepare a considerably less detailed [EA]." Id. Preparation of an EA helps the agency "determine whether a proposed project will create a significant effect on the environment" and thereby require preparation of an EIS. Id. Finally, "[i]n certain narrow instances, . . . an agency is not required to prepare either an [EA] or an [EIS]." Id. "This occurs when the proposed action falls within a [CE], *i.e.*, those actions predetermined not to 'individually or cumulatively have a significant effect on the human environment.'"[3] Id. (quoting 40 C.F.R. § 1508.4).

The role of a federal court under NEPA is to review the EIS, EA, or CE, as the case may be, and "simply . . . ensure that the agency has adequately considered and disclosed the environmental impact of its actions." Wyo. v. United States Dep't of Agric., 661 F.3d 1209, 1256–57 (10th Cir. 2011) (quotation marks omitted).

---

[3] "The Council on Environmental Quality (CEQ) is tasked with interpreting NEPA and establishing regulations governing agencies' responsibilities under the statute." Sierra Club, Inc. v. Bostick, 787 F.3d 1043, 1063 (10th Cir. 2015). "CEQ regulations require federal agencies to consider all of the reasonably foreseeable direct, indirect, and cumulative effects of an agency's action." Id. (citing 40 C.F.R. §§ 1508.7, 1508.8).

27

The district court in this case, applying these principles, rejected the plaintiffs' assertion that the FTA failed to "take a 'hard look' at the City's CE application and that the FTA's decision to approve the CE application was arbitrary and capricious." App., Vol. 7 at 1058. The district court noted that defendant "Donald Koski, [the] Director of Planning and Program Development of Region VI of the FTA," testified at the evidentiary hearing "that his staff reviewed a draft of the CE application, communicated with the City regarding its project development request, consulted with the SHPO, and reviewed the final CE application as did [he]." Id. "These actions," the district court concluded, "demonstrate[d] that the FTA took the required 'hard look' at the CE application." Id.

The district court also rejected the plaintiffs' argument "that the FTA's action was arbitrary and capricious because the City's CE application did not consider economic impacts on businesses or traffic issues such as congestion and diversion of traffic to neighborhoods adjacent to Central Avenue." Id. In doing so, the district court noted that "[t]he City . . . provide[d] the FTA with a business access technical supplement and a traffic assessment technical supplement in response to the CE worksheet's request for information related to 'economic environment' and traffic patterns." Id. And "[t]hose supplements," the district court noted, "indicate[d] that no business w[ould] lose access, congestion w[ould] be minimized with signalized left and u-turns, and that diversion into

28

neighborhoods would amount to 250 vehicles daily." Id. The district court also noted that "[t]he diversion number [wa]s supported by a traffic engineer's expert opinion." Id. The district court thus "conclude[d] that the FTA considered relevant factors, like economic environment and traffic patterns." Id. at 1059.

Lastly, the district court rejected the plaintiffs' argument that the FTA should not have approved the CE "because there was a 'substantial controversy on environmental grounds.'" Id. The district court noted that although "[t]he CE application include[d] a detailed summary of comments, including negative comments," it concluded that "those comments d[id] not suggest 'substantial controversy on environmental grounds.'" Id. More specifically, it noted that "[g]eneral concerns and even economic impacts are not 'environmental grounds' for purposes of assessing public controversy." Id. "Moreover," the district court noted, "the negative comments did not identify a substantial controversy over the size, nature or effect of the environmental impacts." Id. at 1060. "Instead," the district court noted, "many people complained about cost, access to businesses, lost parking, removal of the median, and preferred alignments," none of which "meet the legal test." Id.

In Issue I of their appeal, plaintiffs contend the district court erred in concluding "that the FTA could satisfy its 'hard look' requirement by examining the City's submissions, rather than at the project's environmental effects themselves." Aplt. Br. at 17–18. In other words, plaintiffs argue, it "is

29

impermissible under NEPA" for the FTA to rely exclusively on the City's submissions. Id. at 31. But plaintiffs did not make this argument below, nor did they cite below the cases they now cite in their appellate brief. Indeed, this argument appears to be contrary to the arguments made by plaintiffs in their motion for preliminary injunction. In their preliminary injunction motion, plaintiffs argued that "[t]he FTA had all the evidence it needed to show that a CE was inappropriate for ART." App., Vol. 2 at 211. More specifically, plaintiffs argued that "the data submitted by the City in its CE and grant applications, if the FTA had examined it, would have shown . . . [t]hat ART would significantly impact Central's traffic, congestion, neighborhoods and shops." Id. But, plaintiffs argued, "[n]ot only did the FTA not give this data or the project itself a 'hard look' as NEPA requires[,] the FTA seems to have given it no look at all." Id. As noted, the district court rejected this argument based upon the testimony presented at the evidentiary hearing. Because the argument that plaintiffs now assert — that it was impermissible for the FTA to rely exclusively on the City's submissions — was not made below and is being asserted for the first time on appeal, "we would be well within the boundaries of our discretion to decline to consider [it]." Fish, 840 F.3d 710, 2016 WL 6093990, at *13.

Even if we were to reach this new argument, we would conclude that it lacks merit. Notably, the primary case cited by plaintiffs in support of their argument, Van Abbema v. Fornell, 807 F.2d 633 (7th Cir. 1986), expressly

30

recognizes that it is permissible for an agency to "rely on reports prepared by outsiders or applicants." Id. at 642. To be sure, Van Abbema also cautions that "when such [outside] information is specifically and credibly challenged as inaccurate, the [agency at issue] has an independent duty to investigate." Id. But the plaintiffs in this case did not challenge the City's report as inaccurate. Instead, as noted above, they argued that it actually supported their position. Moreover, the district court in this case found, after hearing testimony from an FTA official, that the FTA agreed with the City's report only after carefully and independently considering it. Thus, in the end, plaintiffs have failed to establish that the FTA was obligated to conduct its own, independent investigation, or that it otherwise acted improperly in relying on the City's report.

The only other challenge that plaintiffs mount to the district court's analysis of their NEPA-based claim is, as outlined in Issue III of their appellate brief, that the district court erred in concluding that the controversy regarding the ART Project did not involve environmental concerns. In support of this challenge, plaintiffs first point to 23 C.F.R. § 771.118, which is entitled "FTA categorical exclusions," and provides, in pertinent part, as follows:

> (a) Categorical exclusions (CEs) are actions which meet the definition contained in 40 CFR 1508.4, and, based on past experience with similar actions, do not involve significant environmental impacts. They are actions which: do not induce significant impacts to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, historic or other

31

resource; do not involve significant air, noise, or water quality impacts; do not have significant impacts on travel patterns; or do not otherwise, either individually or cumulatively, have any significant environmental impacts.

(b) Any action which normally would be classified as a CE but could involve unusual circumstances will require FTA, in cooperation with the applicant, to conduct appropriate environmental studies to determine if the CE classification is proper. Such unusual circumstances include:

> * * *

> (2) Substantial controversy on environmental grounds;

> * * *

23 C.F.R. § 771.118(a), (b)(2). Plaintiffs in turn point to 40 C.F.R. § 1508.27, which defines the term "significantly" for purposes of NEPA, and states, in pertinent part:

Significantly as used in NEPA requires considerations of both context and intensity:

* * *

(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

> * * *

> (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

> (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

32

* * *

40 C.F.R. § 1508.27(b)(4), (5).  Plaintiffs argue that "[t]he District Court apparently did not consider the mountain of extrinsic evidence regarding the intensity of the controversy surrounding ART, presumably because the City had not disclosed the controversy to the FTA and because the FTA had not included in the Administrative Record the many hundreds of communications it had received in opposition."  Aplt. Br. at 35-36.  Plaintiffs further argue that "[t]he District Court did not explain what could be considered 'environmental' in the context of an urban BRT project, and ignored CEQ regulations that define environmental impacts as including 'aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative.'"  Id. at 36 (quoting 40 C.F.R. § 1508.8(b)).

The problem with plaintiffs' arguments is that they ignore the CEQ's definition of "human environment":

> Human environment shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment.  (See the definition of "effects" (§ 1508.8).)  <u>This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement</u>.  When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

40 C.F.R. § 1508.14 (emphasis added).  As we have noted in applying this definition, "[i]t is well-settled that socioeconomic impacts, standing alone, do not

33

constitute significant environmental impacts cognizable under NEPA." Cure

Land, LLC v. United States Dep't of Agric., 833 F.3d 1223, 1235 (10th Cir.

2016). Instead, only when an action "'will have primary impact on the natural

environment'" will "'secondary socio-economic effects . . . be considered.'" Id.

at 1235 n.10 (quoting Image of Greater San Antonio v. Brown, 570 F.2d 517, 522

(5th Cir. 1978)). And that problem is fatal to the plaintiffs, for the vigorous

public opposition to the ART Project that plaintiffs point to was clearly founded

on concerns other than the impact the ART Project would have on the natural

environment. More specifically, as the district court noted in rejecting plaintiffs'

argument that there was a substantial controversy on environmental grounds, "the

negative [public] comments" cited by plaintiffs concerned "cost, access to

businesses, lost parking, removal of the median, and preferred alignments," none

of which concerned the impact of the ART Project on the natural environment.

App., Vol. 7 at 1059-60.

Thus, in sum, plaintiffs have failed to establish that the district court erred

in analyzing the merits of their NEPA-based claim.

*3) The NHPA-based claim*

"NHPA, like NEPA, is a procedural statute requiring government agencies

to stop, look, and listen before proceeding when their action will affect national

historical assets." Presidio Historical Ass'n v. Presidio Trust, 811 F.3d 1154,

1169 (9th Cir. 2016) (quotation marks omitted). Of relevance here, Section 106

34

of NHPA "requires an agency undertaking a project expected to adversely affect a public or private site listed on the National Register of Historic Places to 'take into account the effect of the undertaking on any historic property.'" Id. at 1168 (quoting 54 U.S.C. § 306108). In fulfilling this statutory obligation, a federal agency must also comply with relevant NHPA regulations. For example, the agency must take into account the area of potential effects (APE), which is defined as "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist." 36 C.F.R. § 800.16(d). The agency must also, as relevant, consult with the SHPO in identifying the area of potential effects and determining the likely effect of the undertaking at issue. See 36 C.F.R. §§ 800.4(a)–(c), 800.5(a), 800.6(a), 800.16(f).

We have emphasized that "[e]stablishing an [APE] requires a high level of agency expertise, and as such, the agency's determination is due a substantial amount of discretion." Valley Cmty. Pres. Comm'n, 373 F.3d 1078, 1092 (10th Cir. 2004).

In challenging the FTA's and the City's Section 106 analysis as arbitrary or capricious, plaintiffs voiced a number of arguments in the district court. To begin with, plaintiffs complained that the FTA and the City failed to consider the full impact of the ART Project. For example, they "complain[ed] that the FTA defined the APE too narrowly and [they] argue[d] that the ART [P]roject w[ould]

35

'directly or indirectly cause alterations in the character or use of historic properties' beyond just the bus stations." App., Vol. 7 at 1060 (quoting 36 C.F.R. § 800.16(d)). In addition, plaintiffs "argue[d] that the FTA ignored the fact that the ART [P]roject w[ould] introduce 'visual, atmospheric or audible elements' that w[ould] diminish the historical nature of properties." Id. (quoting 36 C.F.R. § 800.5(a)(2)(v)). Plaintiffs also argued that the City was required to "consider the cumulative impact of ART in determining whether ART w[ould] adversely affect historic resources." Id.

The district court rejected these arguments, stating as follows:

> The FTA, in consultation with the SHPO, defined the APE and considered potential effects of ART, and so concluded that they would not have an adverse effect on any historic resource. Moreover, the eclectic nature of Central Avenue does not lend itself to being designated a historic district. As Jeff Fredine[, a private environmental planner and historian cultural resources specialist hired by the City to perform the Section 106 consultation work on the ART Project,] testified, historic districts are comprised of a similarly aged and designed cluster of properties. This testimony is in line with David Kammer's 2003 study, relied on by the City in its CE application: "Route 66, as an individual property type, through the current project area does not retain enough integrity to convey its historic significance and is recommended not eligible to the National Register of Historic Places (NRHP)." ABQ PAR 03011-12. Although, [sic] Kammer states that the Historic Preservation Department and others "should collectively address the possibility of nominating Route 66–related historic districts in urban areas" including in Albuquerque, that possibility has not been addressed and planners such as Fredine continue to concur with Kammer's conclusion that Route 66 in Albuquerque, though historic and much loved by Albuquerqueans and tourists alike, would not be eligible for inclusion on the NRHP. Route 66 Resurvey Pt. 2, pg. 19-20. Indirect effects, like a change in the feeling or setting of Central

36

Avenue after the ART [P]roject is built, would also not necessarily affect the historic integrity of Central Avenue when one considers the lack of cohesive design in properties.

Id. at 1060-61.

The plaintiffs also complained "that the FTA did not provide the SHPO with the City's traffic study." Id. at 1061. The district court summarily rejected this argument, noting that "[t]he SHPO knew what the ART design would be, including median stations," and that the plaintiffs "ha[d] not sufficiently established how a study showing a diversion of 250 cars per day and possible increased congestion at intersections in 2035 would affect the SHPO's decision, which was based on a narrow APE and was concerned with visual issues." Id.

Lastly, plaintiffs argued below "that the FTA failed to engage the public or seek public comment as required by . . . NHPA." Id. The district court rejected this argument, noting that "[t]he City . . . conducted public outreach which provided an opportunity to allow comment under . . . NHPA." Id. at 1062. More specifically, the district court noted that "the outreach included numerous one-on-one contacts with the public, door hangers, neighborhood meetings, other public meetings, and various other modes of outreach." Id.

Now, in Issue VI of their appellate brief, plaintiffs argue that "[t]he District Court abused its discretion by disregarding the law and disputed record evidence supporting" their three arguments. Aplt. Br. at 42. To begin with, the plaintiffs argue that the district court "misread[] . . . the governing law" in "uphold[ing] the

37

FTA's 'narrow' APE" on the grounds "that the [SHPO] concurred with the FTA on the scope of the APE." Id. at 43. According to plaintiffs, "[w]hether a SHPO concurs with the APE is not the applicable legal standard for assessing the legal sufficiency of the APE." Id. Instead, plaintiffs argue, 36 C.F.R. § 800.16(d) "requires the APE to be broad enough geographically to include 'areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties.'" Id. at 44 (quoting 36 C.F.R. § 800.16(d) (emphasis added by plaintiffs)). "Moreover," plaintiffs argue, 36 C.F.R. § 800.5(a)(1) "required the FTA to consider, [sic] not only indirect impacts, but also 'reasonably foreseeable effects caused by the undertaking that may occur later in time, [or] be farther removed in distance or be cumulative.'" Id. (quoting 36 C.F.R. § 800.5(a)(1)). The district court, plaintiffs argue, "ignored the record evidence . . . that the FTA defined the APE considering only *direct* impacts of the three small areas in the proximity of proposed ART stations," and it also "disregard[ed] the fact that there exists no evidence or even claims by Appellees that they ever considered indirect and cumulative impacts resulting from ART." Id. at 45 (emphasis in original).

The problem with plaintiffs' arguments is two-fold. First, plaintiffs are wrong in suggesting that the SHPO's concurrence in the APE carries no weight. Indeed, the applicable regulations require the FTA to consult with the SHPO in determining the APE, see 36 C.F.R. § 800.4(a), and we have expressly cited the

38

fact of an SHPO's concurrence in upholding an APE, see Valley Cmty. Pres. Comm'n, 373 F.3d at 1091.  Second, plaintiffs misread the record in asserting that the APE considered only the direct effects or impacts of the ART Project.  The administrative record quite clearly establishes that the City and the FTA, with the concurrence of the SHPO, concluded that the ART Project would not have any direct effects or impact on historic properties.  Thus, the APE focused on the indirect visual effects stemming from the ART Project, most notably the visual effects from the canopies of certain proposed bus stations.  And the City modified the ART Project in certain respects to reduce the visual impacts of proposed ART stations in certain historic districts.

Plaintiffs next argue, as part of Issue VI, that the district court "abused its discretion by shifting the burden of assessing adverse effects onto [them]."  Aplt. Br. at 48.  According to plaintiffs, they "pointed out [below] that one of the adverse effects that the FTA failed to consider by limiting the APE to direct impacts around the areas of the ART stations was the diversion of traffic from Central Avenue to adjacent neighborhoods including [four] historic districts."  Id. And that concern, plaintiffs argue, "is factually justified from the City's own traffic study, which predicts 200-250 vehicles during a single peak PM hour will be diverted from Central Avenue at Edith Boulevard and Locust Street," both of which "are parts of Huning Highland, a historic district on the National Register of Historic Properties."  Id. at 48-49.  Plaintiffs assert that the district court

39

"misstated the traffic diversion as vehicles per *day* instead of vehicles during a single peak *hour*." Id. at 49 (emphasis in original). The district court also, plaintiffs argue, "misstate[d] [their] legal burden and the governing law by rejecting their concerns" about this diversion of traffic. Id. According to plaintiffs, "[t]here can be no legitimate dispute that the presence of diverted traffic into the adjacent historic districts will have *some* effect on them and the law required the FTA to consider whether such effects result in an 'adverse effect.'" Id. at 50 (emphasis in original) (quoting 36 C.F.R. § 800.5). Because the FTA "did not consider traffic diversion at all," plaintiffs argue, "it is beyond dispute that the FTA did not define the APE with sufficient expansiveness to have considered and assessed these effects directly, indirectly, or cumulatively on the historic districts." Id. at 51.

Plaintiffs are possibly correct on one point: the district court did arguably misstate the data regarding the number of vehicles that would be diverted from Central Avenue by the ART Project. Although the district court stated that the diversion number would be 250 vehicles per day, the traffic modeling that was conducted by the City actually indicated that "[a] maximum of 250 vehicles during the PM peak hour (eastbound)" would be "divert[ed] from Central Avenue." App., Vol. 8 at 1153. It is unclear from the record whether any non-peak hour diversions would occur. Thus, the figure stated by the district court may or may not be correct.

40

The remainder of plaintiffs' arguments, however, must be rejected. To begin with, the arguments that plaintiffs now make regarding diverted traffic flow are nowhere to be found in the brief they filed in support of their motion for preliminary injunction. Instead, they argued in that brief that "the FTA inappropriately limited the APE to areas adjacent to bus stations," and "entirely disregarded . . . destruction, alteration, character changes, and introduction of visual and atmospheric impact by the ART [P]roject." App., Vol. 2 at 222. Because plaintiffs' arguments regarding diverted traffic flow were not asserted below, we are under no obligation to address them for the first time in this appeal.

Moreover, even if we were to address these arguments, plaintiffs themselves misstate the record in suggesting that this diverted traffic would flow into, and negatively impact, four historic neighborhoods. To begin with, the City's traffic modeling suggested that a portion of the 250 vehicles would "shift to a time outside of the peak hour." Id. In other words, some of the 250 vehicles would not divert to other nearby roads at all, but instead would drive down Central Avenue at alternative times. Further, the City's traffic modeling indicated that the remainder of the 250 vehicles would divert "from Central Avenue to parallel arterial streets," most namely "the Lead Avenue/Coal Avenue one-way pair approximately 1/4 mile south of Central Avenue, and Lomas Boulevard, a six-lane principal arterial north of Central Avenue." Id. And, the City's modeling indicated, "[a]ccording to volume-to-capacity data . . . , Lomas

41

Boulevard and Lead Avenue/Coal Avenue have adequate capacity to accommodate the traffic diverted from Central Avenue." Id. Finally, nothing in the record indicates that the traffic actually diverted from Central Avenue during the "PM peak hour" will "directly or indirectly cause alterations in the character or use of historic properties" on or near Central Avenue, as would be necessary to raise concerns under NHPA. 36 C.F.R. § 800.16(d) (defining APE).[4] For these reasons, plaintiffs have failed to demonstrate a likelihood of establishing that the FTA erred in defining the APE, or that the district court erred in rejecting their arguments on this point.

Plaintiffs also argue, again as part of Issue VI, that the APE was inaccurate because the ART Project "will not remain within the existing roadway footprint" and instead will require the City to "acquir[e] over an acre of property from both private and public property owners." Aplt. Br. at 52. Relatedly, plaintiffs argue that the APE failed to take into account the fact that the ART Project will create "substantial subsurface disturbance with accompanying vibrational and noise impacts to historic buildings and districts along the ART route resulting from the construction of ART." Id.

These arguments were not asserted by plaintiffs in the brief they filed with

---

[4] As the City argues in its appellate response brief, "there is no mention [in the record] of traffic volumes as contributing to the historic significance of [the four] districts [at issue] or as having the potential to negatively affect their historic significance." City Aplee. Br. at 49.

42

the district court in support of their motion for preliminary injunction, and thus we are under no obligation to address them in this appeal. Even if we were to address these arguments, we would conclude that they lack merit because plaintiffs have failed to describe why the APE would have been any different had the City and the FTA considered these two factors (i.e., the need for the City to acquire approximately an acre of property to complete the ART Project, or the vibrational and noise impacts), and they also fail to establish that the FTA acted arbitrarily or capriciously in failing to consider these factors. Or, as the City aptly argues, these arguments "rel[y] on the absence of overt discussion of the issue and not on any evidence that [the acquisition of property by the City for the ART Project or the] temporary construction vibrations will in fact be a problem" in terms of negatively impacting historic properties. City Aplee. Br. at 51.

Plaintiffs next argue, as part of Issue VI, that it was an abuse of discretion for the district court to "defer[] to the conclusion of Jeff Fredine in his Cultural Inventory Addendum that Central Avenue/Route 66 is not eligible for placement on the National Register [of Historic Places]." Aplt. Br. at 53. Fredine's conclusion, plaintiffs argue, "rests on [his] gross mischaracterization of a survey carried out by Route 66 Historian, Dr. David Kammer." Id. To begin with, plaintiffs argue, the portion of Kammer's survey that Fredine relied on actually addressed a section of Route 66 that is outside of Albuquerque. Id. at 53-54. "To make matters worse," plaintiffs argue, "Kammer actually recommended [in his

43

2003 survey] that Route 66–related historic districts," such as those inside the Albuquerque city limits, "*should* be nominated for eligibility." Id. at 54 (emphasis in original).

Plaintiffs again mischaracterize the record in making these arguments. During his direct testimony at the evidentiary hearing, Fredine explained that he and the City

> evaluated [Route 66] as a property itself in addition to Route 66-associated buildings, and what we found, which is consistent with previous research [including Kammer's prior research], was that due to the adjustments that are common in urban environments, especially one the size of Albuquerque, that the historic integrity of Route 66 itself through the — through Albquerque was not — there was not enough remaining to make it eligible for the National Register [of Historic Places].

App., Vol. 24 at 3055. Fredine testified that, as "general background" material, id. at 3062, he relied on two surveys that Kammer had published, one in 1993 and an updated version in 2003, "document[ing] historic and architectural resources of Route 66 throughout New Mexico," id. at 3056. Fredine noted that neither survey "list[ed] Central [Avenue] or Route 66 through Albuquerque as a historic property or one that's eligible for the National Register [of Historic Places]." Id.

On cross-examination, Fredine acknowledged that the portion of Kammer's survey that he relied on addressed rural areas of Route 66. Id. at 3071. When asked why he relied on that part of the survey in reaching conclusions about an area of Route 66 located in the city limits of Albuquerque, Fredine explained:

44

Because [Kammer's survey] spoke to a methodology he was following where development can impact historic integrity. And I believe I say something in [my] report to the effect of, you know, this may be why [Kammer] was focusing on rural areas other than urban areas. But my intent was to convey that we were looking at urban development as a potential effect to the integrity of a historic resource.

Id. at 3072.

Fredine was asked on cross-examination to read a portion of Kammer's surveys that stated "the Route 66 Preservation Program and NR staff should collectively address the possibility of nominating Route 66–related historic districts in urban areas." Id. at 3073. Fredine was then asked whether Kammer was "saying something [in his surveys] that [wa]s quite different than what [Fredine] attributed to him in [his] report?" Id. at 3074. Fredine responded:

I don't feel that he [wa]s. I feel that [he was] saying there's potential there and that it should be evaluated for a National Register nomination as a district.

What I am referring to [in my report] is the process of impacts to historic integrity which can be by things like urbanization and that process that affect the contiguousness of those individual buildings that are eligible to the National Register.

Id.

Thus, in sum, Fredine provided a rational explanation for the conclusion he reached in his report (i.e., that Route 66, as it ran through Albuquerque, did not qualify as a historic district for purposes of NHPA), and the district court did not abuse its discretion in relying on that testimony

45

Finally, as part of Issue VI, plaintiffs argue that the district court abused its discretion by "disregard[ing] the record evidence establishing that neither the City nor the FTA consulted with the public in carrying out the Section 106 review." Aplt. Br. at 55. According to plaintiffs, "Section 106 regulations make planning for involving the public and actually engaging the public mandatory." Id. at 56 (citing 36 C.F.R. §§ 800.3(e), (f), 800.4). Yet, plaintiffs argue, "[n]o evidence exists that either the City or the FTA ever sought consultation from anyone other than tribes regarding impacts on historic properties." Id.

Plaintiffs' arguments lack merit. To be sure, the applicable regulation states that "[t]he views of the public are essential to informed Federal decisionmaking in the section 106 process." 36 C.F.R. § 800.2(d)(1). But, as the district court correctly noted, the "regulations do not specify the form of public outreach required under NHPA." App., Vol. 7 at 1061. Instead, the regulation affords the "agency official" with discretion to "seek and consider the views of the public in a manner that reflects," in pertinent part, "the nature and complexity of the undertaking and its effects on historic properties." 36 C.F.R. § 800.2(d)(1). Further, and of particular importance here, the regulation states that "[t]he agency official may use the agency's procedures for public involvement under [NEPA] . . . if they provide adequate opportunities for public involvement consistent with this subpart." 36 C.F.R. § 800.2(d)(3).

Notably, the district court found, in rejecting these same arguments made

46

by the plaintiffs, that "[t]he City . . . conducted public outreach [that] provided an opportunity to allow comment under . . . NHPA." App. at 1062. In making this finding, the district court credited the testimony of Michael Riordan, the City's Chief Operations Officer, who "testified the outreach included numerous one-on-one contacts with the public, door hangers, neighborhood meetings, other public meetings, and various other modes of outreach." Id. To be sure, the district court found "that some people did not get the word" and "[m]any of those that did . . . do not believe they were heard." Id. Nevertheless, the district court found "that the City's submissions to the FTA included sizeable numbers of [public] comments," thereby allowing "[t]he FTA [reason to] conclude from the CE application that the City engaged in public outreach would have included comment required by . . . NHPA." Id.

Plaintiffs fail to explain how the district court's factual findings on this issue were clearly erroneous. Moreover, plaintiffs make no attempt to undercut the testimony of Riordan regarding the measures that were taken to elicit public comment. Consequently, there is no merit to their argument that the district court abused its discretion in reaching the conclusion that it did.

In sum, then, plaintiffs have not established any error on the part of the district court in concluding that they failed to establish a substantial likelihood of success on the merits of their NHPA-based claim.

47

*Irreparable harm*

The district court concluded that plaintiffs failed to "satisf[y] the irreparable harm requirement for a preliminary injunction." App., Vol. 7 at 1064. In reaching this conclusion, the district court stated:

> Plaintiffs, in this case, have presented evidence that businesses and neighborhoods will be harmed by traffic congestion, safety issues, aesthetic and cultural loss, and loss of business. Indeed, testimony from witnesses Steve Paternoster, Anthony Anella, and Buck Buckner, for example, suggests a loss of business as a result of ART. However, Plaintiffs have not demonstrated that the asserted harms are irreparable. The City states in its briefing that the ART lanes could be redesignated as general use lanes without much trouble. Moreover, economic injuries are not irreparable, because they are typically compensable with monetary damages. See Heideman v. S. Salt Lake City, 348 F.3d 1182, 1189 (10th Cir. 2003) ("It is also well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages.").
>
> Furthermore, the evidence shows any harm will also not be "certain or great." No business will close and at least one lane of Central will be open during construction. Once ART is built, left-hand turns will be restricted but it is not expected they will not [sic] prevent customer access. Moreover, the evidence indicates that over all access will improve with ART. The witness testimony about business decline, while sincere, does not meet the legal test: Plaintiffs have not provided any specific numbers or hard projections, for example, to show how much business will be lost. Also, any loss of foot traffic during construction would be temporary and foot traffic is expected to actually increase after ART is built due to improved streetscape. In addition, the City will implement several mitigation actions during construction to minimize impact such as construction notices, low-or no-interest loans, and business consultants.
>
> In addition, conclusory assertions of aesthetic harm are not sufficient to establish irreparable harm.

48

Id. at 1063-64.

In Issue IV of their appellate brief, plaintiffs argue that the district court abused its discretion in relying on the City's assertion "that the dedicated lanes could be repurposed as general traffic lanes." Aplt. Br. at 37. According to plaintiffs, this was merely a statement in the City's brief in opposition to plaintiffs' motion for preliminary injunction, and was "entirely without support in the evidence." Id.

Plaintiffs are correct that the City's brief in opposition to plaintiffs' motion for preliminary injunction stated, without a citation to any evidence: "As an initial matter, construction of ART would not impose any irreparable injury for the simple reason that the ART lanes could be redesignated as general purpose lanes or turn lanes, with relatively modest changes, were the Court to find the project impermissible on some basis on the merits." App., Vol. 4 at 564. The problem for plaintiffs, however, is that they failed to respond to this assertion in the reply brief that they filed with the district court in support of their motion for preliminary injunction. In that reply brief, plaintiffs briefly discussed the issue of irreparable harm, but made no mention of the City's assertion that the ART Project lanes could be redesignated if necessary. Consequently, plaintiffs have waived this argument for purposes of appeal.

Plaintiffs next argue in Issue IV of their appellate brief that the district court erred in concluding that their economic harms were "'compensable by

monetary damages.'" Aplt. Br. at 37 (quoting App., Vol. 7 at 1063). According to plaintiffs, "[t]he District Court did not posit any legal theory on which [they] could recover damages," and "[o]ther courts have routinely rejected arguments that even a theoretical theory for recovery of damages for environmental harm can be treated as a substitute for injunctive relief in a NEPA case." Id. Plaintiffs further argue that the district court improperly criticized them for failing to provide "specific numbers or hard projections" regarding the economic damages they might suffer as a result of the ART Project. Id. at 38. And plaintiffs argue that the district court improperly "speculated that the ART [P]roject might well *improve* businesses and other aspects of life along Central [Avenue]." Id.

These arguments largely miss the central point of the district court's irreparable harm analysis. Having concluded that plaintiffs failed to establish a substantial likelihood of success on the merits of their NEPA and NHPA-based claims, the district court in turn concluded that the only potential harms identified by plaintiffs were largely economic in nature and mostly speculative at that. Under Tenth Circuit law, it is well established that "economic loss is usually insufficient to constitute irreparable harm." Crowe & Dunlevy, P.C. v. Stidham, 640 F.3d 1140, 1157 (10th Cir. 2011). Notably, plaintiffs make no attempt to demonstrate that this case is an exception to the general rule.

As for plaintiffs' assertion that the district court "speculated that the ART [P]roject might well *improve* businesses and other aspects of life along Central

50

[Avenue]," what the district court actually said is that "the evidence indicate[d] that over all access w[ould] improve with ART." App., Vol. 7 at 1063. Plaintiffs make no attempt to challenge this assessment of the evidence.

For these reasons, we conclude that plaintiffs have failed to establish that the district court abused its discretion in concluding that plaintiffs failed to establish the existence of irreparable harm.

*Balance of harms and public interest factors*

The district court concluded that the balance of harms did not favor granting plaintiffs a preliminary injunction. In reaching this conclusion, the district court emphasized that "[p]laintiffs' harms . . . reflect[ed] personal preferences, but . . . d[id] not meet the legal test." Id. at 1065. "Furthermore," the district court noted, "not allowing ART to go forward w[ould] keep the City from building a project to revitalize the area and address pedestrian safety and improve transit efficiency." Id. In addition, the district court noted that "the evidence sufficiently indicate[d] that delaying ART w[ould] lead to increased construction costs [of up to $7,500 per day] because the City w[ould] have to pay its contractors to keep them mobilized during cold weather and for any period of delay caused by an injunction." Id. (quotation marks omitted). Lastly, the district court noted that "the City's . . . construction schedule [wa]s such that it w[ould] minimize impacts to businesses and residents, especially during peak shopping times during Christmas, Summerfest, Balloon Fiesta, and State Fair."

51

Id.

The district court also concluded "that the public interest require[d] denying an injunction." Id. at 1066. The district court explained that "[c]ompleting the ART [P]roject on time w[ould] address existing safety concerns sooner and save the public money due to construction delays," and that "an injunction w[ould], in part, serve Plaintiffs' private interests, i.e., their business and financial interests, rather than the public's interest at large." Id. The district court also "acknowledge[d] that at least a majority of the City Council, the Mayor, and other elected officials ha[d] investigated the ART [P]roject and ha[d] determined that it [wa]s in the public's interest." Id.

In Issue IV of their appellate brief, plaintiffs argue that the district court "misunderstood the 'balance of harms' and 'public interest' in the context of injunctive relief from NEPA violations." Aplt. Br. at 39. To begin with, plaintiffs argue that it was wrong for the district court to rely on the City's claim that it would lose $7,500 per day in contractual damages if an injunction were issued. In support, plaintiffs note that in Davis v. Mineta, 302 F.3d 1104, 1116 (10th Cir. 2002), we concluded, in the context of a NEPA-based claim, that delay costs that would be incurred by the Utah Department of Transportation (UDOT) if an injunction were issued in favor of plaintiffs "may [have] be[en] self-inflicted" by "state entities . . . 'jump[ing] the gun' on the environmental issues by entering into contractual obligations that anticipated a pro forma result." And the same is

52

true in this case, plaintiffs argue, because "the City entered into contracts *during the period that this Court had temporarily enjoined the City from proceeding.*" Aplt. Br. at 40 (emphasis in original).

But plaintiffs' arguments misstate the record in this case. On August 1, 2016, the same day the appeal was docketed, plaintiffs filed an emergency motion to stay the district court's order and for emergency injunctive relief pending consideration of their appeal. Later that same day, we issued an order directing the City and the FTA to file written responses to plaintiffs' emergency motion by August 2, 2016. The order also directed the City to "include in its response information on the nature and timing of any demolition or construction related to the ART project that is planned between now and the close of business on Wednesday, August 10, 2016." Order at 1. Lastly, the order temporarily enjoined defendants "from taking any action on the ART project until further order of the court." Id. at 2.

On August 2, 2016, the City filed a written response to plaintiffs' emergency motion, and also filed its own emergency motion for limited modification of the court's August 1, 2016 order. In both pleadings, the City explained that at approximately 8:30 a.m. on August 1, 2016, prior to the issuance of our order, "the City executed a contract for certain pre-construction work" that was "non-destructive and temporary in nature." City's Emergency Motion at 2. The City thus asked us to modify our August 1, 2016 order to allow this pre-

53

construction work to begin. The City also stated in its response that, absent our issuance of an injunction, it intended to execute a contract authorizing construction work on August 22, 2016, and that it expected demolition or destructive work to start on September 3, 2016.

On August 2, 2016, we issued an order granting the City's emergency motion to modify the temporary injunction to allow the pre-construction work to proceed. Little more than two weeks later, on August 19, 2016, we issued an order denying plaintiffs' motion for stay and injunction pending appeal and vacating the temporary injunction that was entered on August 1, 2016.

In light of this procedural history, there is no merit to plaintiffs' assertion that the City entered into contracts during the period that we temporarily enjoined the City from proceeding. To the contrary, the City entered into the pre-construction contract prior to the issuance of our temporary injunction order, and it entered into the construction contract after we lifted the temporary injunction order and denied plaintiffs' motion for stay and injunction pending appeal.

Moreover, the key difference between Davis and the case at hand is that we concluded that the plaintiffs in Davis were likely to succeed on the merits of their NEPA claim, i.e., that UDOT officials erred in concluding that the highway construction project at issue would have no significant effect on the environment. Here, in contrast, plaintiffs have failed to establish a substantial likelihood of prevailing on either their NEPA-based claim or their NHPA-based claim. Thus, it

54

was not necessarily improper in this context for the district court to take into account the additional costs that would be incurred by the City if an injunction were issued.

Lastly, plaintiffs argue, as part of Claim IV of their appellate brief, that "[a]s to the related 'public interest' prong of the test for preliminary injunctive relief, this Court and others have consistently identified the strong public interest in the enforcement of NEPA." Aplt. Br. at 41. While that is true, the fact remains that plaintiffs have failed to establish a substantial likelihood of prevailing on the merits of their NEPA-based claim. Consequently, they have failed to establish that the public interest would be served if a preliminary injunction were entered in their favor.

## III

We AFFIRM the district court's denial of a preliminary injunction and REMAND the case for further proceedings.

55